IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| SECURENET SOLUTIONS GROUP, LLC, | § § § | |
| Plaintiff | § § | |
| v. | § § | Case Number 2:25-cv-01229 |
| SIGNIFY N.V. and SIGNIFY NETHERLANDS B.V., | § § § | |
| Defendants | § § | |

## PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff SecureNet Solutions Group, LLC, acting by and through its counsel, files this Complaint against Defendants Signify N.V. and Signify Netherlands B.V. (collectively "Defendants") for the unauthorized manufacture, use, offer to sell, sale, or import of Plaintiff's patented invention, within and into the United States of various video analytics solutions. Defendants offer and sell technologies for profit that are protected by, and infringe upon, Patents owned by Plaintiff, including but not limited to U.S. Patent Nos. 11,323,314 (claim 13), 11,929,870 (claim 20), and 12,375,342 (claim 17) (the "Asserted Patents"). Defendants' infringing products include, but are not limited to, the Hue Secure Ecosystem, which includes one or more of the following: Signify Secure Camera, Signify Bridge Pro, Signify Hue Application, and Signify Cloud.

**PARTIES**

1.      Plaintiff SecureNet Solutions Group, LLC is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business at 3425 Bannerman Road, Suite 105-428, Tallahassee, Florida 32312.

2.      On information and belief, Defendant Signify N.V. is a multinational corporation organized under the laws of the Netherlands with its principal place of business located at High Tech Campus 48, 5656 AE Eindhoven, The Netherlands.

3.      On information and belief, Defendant Signify Netherlands B.V. is a corporation organized under the laws of the Netherlands, with its principal place of business located at High Tech Campus 48, 5656 AE Eindhoven. Defendant Signify Netherlands B.V. shares the same corporate office/headquarters with its direct parent Signify Holding B.V. (a corporation formed under the laws of The Netherlands) and with Signify N.V., which is the parent company of all Signify subsidiaries.

**JURISDICTION AND VENUE**

4.      This action arises under the Patent Laws of the United States, Title 35 of the United States Code.  This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.      According to the U.S. directed website, www.singify.com/en-us, "Signify is the world leader in lighting" and "enhances public spaces, work places, and homes."

6.      Defendants "operate in many countries through its subsidiaries and affiliated companies, as well as via a limited number of branch offices, which

2

primarily    act    under    the    Signify    trade    name." *See* https://www.signify.com/static/2024/signify-annual-report-2024.pdf, at page 150.

7.     As of the release of its 2024 Annual Plan, Defendants have "a global presence in 70 markets with around 29,500 employees." *Id*. at page 11.  According to the accompanying map, 26% of Defendants' employees are in the Americas, which includes the United States.

8.     In 2024, Defendants' United States sales were approximately €2,095 million and they had approximately €2,590 million worth of tangible and intangible assets in the United States.[1]  *See id*. at page 191.

9.     Defendants offer products under a number of brands, to include Philips and Hue.   According to the Philips Hue U.S. website, www.philips-hue.com/en-us/about-us, "Philips is Signify's primary brand for lamps, luminaires, and other lighting products for both professionals and consumers.  Signify products carrying the Philips brand cover the complete range of lighting applications, from home, office, and industry to street lighting, horticulture, sports, and more."  The webpage further states "Hue is a Signify brand."



---

[1] These sales are taken from the Consolidated Financial Statements and identify the combined sales of Defendant and its subsidiaries.  *Id*. at page 179.

Defendants' www.signify.com/global/brands website also identifies Philips and Hue as "Signify Global Brands."

10.     Defendant Signify N.V. is the parent company in the Signify corporate family.  Defendant Signify N.V.'s controlled subsidiaries include, but are not limited to, Cooper Lighting Netherlands B.V. (Netherlands); Cooper Lighting LLC (United States); Signify (China) Investment Co., Ltd. (China); Signify GmbH (Germany); Signify North American Corporation (United States); and Signify Holding B.V. (Netherlands).  *Id.* at page 196.  Defendant Signify Netherlands B.V. is also controlled subsidiary of Defendant Signify N.V.  *Id.* at page 196.

11.     Defendant Signify N.V. regularly does business in Texas, solicits business in Texas, and/or engages in conduct targeting Texas residents through its controlled subsidiaries, to include Defendants Signify Netherlands B.V. and Signify North American Corporation.  Upon information and belief, Signify N.V. controls or otherwise directs and authorizes all activities of its subsidiaries operating in Texas, to include Defendant Signify Netherlands B.V.  As set forth in further detail below, Defendant Signify Netherlands B.V. is offering for sale and selling Accused Products in Texas.

12.     Upon information and belief, directly and via (at least) Defendant Signify Netherlands B.V. and subsidiary Signify North American Corporation (who act as alter egos of Defendant Signify N.V. or agents of Defendant Signify N.V.), Defendant Signify N.V. has placed and continues to place Accused Products into the U.S. stream of commerce with knowledge and understanding that the Accused

Products are, will be, and continue to be sold and offered for sale into the State of Texas.  Upon information and belief, Defendant Signify N.V. utilizes established distribution channels to distribute, market, offer to sell, and sell Accused Products, to include in Texas and in this judicial district.

13.    Signify North American Corporation receives Signify products shipped by the Signify group, including, but not limited to, by Signify Netherlands B.V.  These Signify products are distributed, offered for sale and sold by Signify North American Corporation as part of and on behalf of the Signify group (to include the Defendants).

14.    Until 2024, the Signify group maintained a place of business in San Marcos, Texas that included design, testing, demonstration, and manufacturing operations.  The San Marcos, Texas facility manufactured, among other things, PHILIPS branded products for Defendants.  Upon information and belief, at least some of the Accused Products were designed, tested, demonstrated, and/or manufactured in the San Marcos facility within the six years preceding the institution of this suit.

15.    Defendant Signify Netherlands B.V. imports Signify products into the U.S. for distribution and sale by U.S. based subsidiaries of Defendant Signify N.V. and by third-party distributors.

16.    Defendant Signify Netherlands B.V. promotes Signify and Phillips Hue products in the United States, to include in Texas and this judicial district, through the Signify United States website, https://www.signify.com/en-us/.  The "Site Owner" page of this website identifies Defendant Signify Netherlands B.V. as the site owner.

17.     The Signify United States website directs United States consumers to locations through which they can purchase Signify products (to include Philips and Hue brand products).  Clicking on the "Brands" menu on this website provides a set of links to various product brand lines, which is shown in the screenshot below:



18.     A United States consumer who wants to purchase Signify products sold under the Philips and/or Hue brands can visit the United States website for Philips Hue through the link in the menu in the preceding paragraph or by going directly to the Philips Hue website, www.philips-hue.com/en-us/.  U.S. customers, to include customers in Texas, can then purchase Defendants' Philips Hue brand products through the Philips Hue website.

19.     Defendants' Philips Hue brand security products, at least some of which are Accused Products in this suit, are available for U.S. customers, to include customers in Texas, to purchase at https://www.philips-hue.com/en-

us/products/smart-security.    As an example, the screenshot below shows the eCommerce functionality of the Philips Hue website as it applies to one of the Asserted Products:



20.    A review of the terms of service for the Philips Hue U.S. website demonstrates that the website is run by Defendant Signify Netherlands B.V.  In particular, the terms of service (available at https://www.philips-hue.com/en-us/support/legal/terms-conditions) state, "This website…is offered to you by Signify Netherlands B.V."  Accordingly, Defendant Signify Netherlands B.V. sells Signify products, to include Accused Products, directly into the United States.

21.    U.S. customers, to include customers in Texas, can purchase Defendants' Philips Hue brand through U.S. retailers.  By way of example, one retailer that U.S. customers can visit to purchase Defendants' Philips Hue brand products is Home Depot.  The "Tyler" location of Home Depot is located at 3901 Old

Jacksonville Hwy, Tyler, Texas 75701.  As shown in the screenshot below, Texas customers can purchase Defendants' Philips Hue security cameras, which are part of the Accused Products, through the Tyler Home Depot.



By way of another example, U.S. customers can purchase Defendants' Philips Hue brand products such as Hue Secured Wired Camera, Hue Secure Battery Camera, Hue Secure Floodlight Camera, and Hue Secure Video Doorbell through the Home Depot store located at 1224 N Central Expy, Plano, TX 75074, as shown in the screenshot below:



22.    Defendants, either directly or through controlled subsidiaries, offer "Home security plans" to camera customers in the Eastern District of Texas. These plans offer "Instant motion notifications," and "AI-powered person, animal, vehicle, and package detection" as well as "AI-powered smart alarms." https://www.philips-hue.com/en-us/explore-hue/propositions/smart-home-security/subscription-plans#Do_the_advanced_features_I_get_with_a_Secure_plan_require_a_Philips_Hue_Bridge Signify Netherlands B.V. is the developer and seller of the App that enables the "Home security plans" offered. See https://apps.apple.com/us/app/philips-hue/id1055281310.

23.    Through offers to sell, sales, imports, distributions, and other related agreements with controlled subsidiaries, distributors, and customers operating in and maintaining a significant business presence in the United States, Defendants do business in the United States, the state of Texas, and the Eastern District of Texas.

24.     This Court has personal jurisdiction over Defendant Signify N.V.  On information and belief, Defendant Signify N.V.:

a.  directly and through directing its controlled subsidiaries conducts business, has committed acts of patent infringement, and has induced acts of patent infringement by others in this District and elsewhere in the United States;

b.  purposefully availed itself of the privilege of conducting activities in this state and this District, including at least part of the infringing activities alleged herein;

c.  directly and through directing its controlled subsidiaries regularly does or solicits business, engages in other persistent conduct targeting residents of Texas, and/or derives substantial revenue from infringing goods offered for sale, sold, and imported to Texas and Texas residents; and

d.  places, has placed, and contributed to placing its products into the stream of commerce through established distribution channels knowing or understanding that such products would be sold and used in the United States, including in this District; and

e.  identifies itself as the manufacturer of the Signify Hue Camera, per the EU declaration of conformity. *See* https://www.assets.signify.com/is/content/Signify/Assets/hue/global/20250724-philips-hue-camera.pdf.

25.    Through direction and control of its subsidiaries, Defendant Signify N.V has committed acts of direct and/or indirect patent infringement in this District, in Texas, and throughout the United States, giving rise to this action.   As such, Defendant Signify N.V. has sufficient minimum contacts with Texas such that personal jurisdiction over Defendant Signify N.V. does not offend traditional notions of fair play and substantial justice.

26.    This Court has personal jurisdiction over Defendant Signify Netherlands B.V.  On information and belief, Defendant Signify Netherlands B.V.:

    a.  directly and in coordination with Defendant Signify N.V. and its controlled subsidiaries conducts business, has committed acts of patent infringement, and has induced acts of patent infringement by others in this District and elsewhere in the United States;

    b.  purposefully availed itself of the privilege of conducting activities in this state and this District, including at least part of the infringing activities alleged herein;

    c.  directly and in coordination with Defendant Signify N.V. and its controlled subsidiaries regularly does or solicits business, engages in other persistent conduct targeting residents of Texas, and/or derives substantial revenue from infringing goods offered for sale, sold, and imported to Texas and Texas residents;

    d.  places, has placed, and contributed to placing its products into the stream of commerce through established distribution channels

knowing or understanding that such products would be sold and used in the United States, including in this District;

e.  provides cloud services via Hue Cloud as noted in the Terms of Use; provisions the Hue App in the Hue iOS app; and is the data controller of data stored in Hue Cloud, per the Data Privacy Notice, to residents of the State of Texas; and

f.  developed and sells the Philips Hue App available at the Apple App Store.

27.   Defendant Signify Netherlands B.V. has committed acts of direct and/or indirect patent infringement in this District, in Texas, and throughout the United States, giving rise to this action.  As such, Defendant Signify Netherlands B.V. has sufficient minimum contacts with Texas such that personal jurisdiction over Defendant Signify Netherlands B.V. does not offend traditional notions of fair play and substantial justice.

28.   Defendants Signify N.V. and Signify Netherlands B.V. are not residents of the United States and therefore venue is appropriate in any judicial district, to include this District, pursuant to 28 U.S.C. § 1391.

29.   A substantial part of the events or omissions giving rise to the claims, to include acts of direct and/or indirect infringement, occurred in this District, such that this District is also a proper venue pursuant to 28 U.S.C. § 1391.

**THE BACKGROUND OF THE ASSERTED PATENTS**

30.    The claims of the Asserted Patents address a need arising specifically within the field of computerized security systems. Inventors Daniar Hussain and Dr. John Donovan conceived of the inventions. Mr. Hussain was educated at MIT in electrical engineering, biomedical engineering, and computer science and studied theoretical geophysics at the University of Cambridge, and environmental engineering and civil engineering at Carnegie Mellon University. He won the Siemens Westinghouse National Science Award (2000), a national award given to one team in the United States for engineering excellence. According to Science Magazine, this is "a junior Nobel Prize." He worked for NASA on techniques for sending satellite image data to mobile devices, and for Siemens Corporate Research developing techniques for 3D image registration. He is a named inventor on more than a dozen U.S. patents and five foreign patents.

31.    Hussain and Donovan conceived the inventions after a three-day workshop with CLEMIS, the IT Department for the Oakland County, Michigan confederation of police departments - the largest confederation of police departments in the country. During the workshop, the police described several major problems with known police IT systems. In 2007 (the priority date for the Asserted Patents), smart surveillance systems gained commercial adoption and started to replace traditional security systems, causing challenges for large-scale data analysis. *See e.g.*, Lisa Brown, Arun Hampapur, Jonathan Connell, Max Lu, Andrew Senior, Chiao-Fe Shu, Yingli Tian, IBM Smart Surveillance System (S3): *An open and extensible architecture for smart video surveillance*, IBM T.J. Watson Research Center,

Proceedings of the IEEE Conference on Advanced Video and Signal Based Surveillance, AVSS 2005, Sept. 15-16, 2005.

32.    The Asserted Patents describe complex systems and methods for capturing, processing, and acting on data relating to security, such as data recorded by video cameras and other sensors.  Additionally, the claims of the Asserted Patents disclose technical solutions to some challenges, such as reducing errors and false positives via a particular computerized process. In particular, the inventors conceived of systems and methods for using integrated cameras, sensor networks, and other data sources with a correlation engine that correlates two or more events weighted by the attribute data of the data sources. Such correlations could effectively connect crime-related events to specific sensor data, other legacy system data, 911 calls, anonymous tips, and video records.

33.    A high-level depiction of one embodiment of the invention is illustrated in Figure 1 of the U.S. Patent No. 11,323,314 (the "'314 patent"):



'314 patent, Fig. 1.

In this embodiment, various types of security-related data are collected from various sources, such as video cameras and other sensory devices, a video tip system, a card access system, a personnel system, and a vehicle information module. These data describe "primitive events," which are "atomic, indivisible event[s] from any subsystem," such as people entering a designated area, a vehicle driving the wrong

way in a designated lane, a package left behind in an area, a person screaming, glass breaking, or a gunshot. '314 patent[2] at 5:21-48.

34.    The primitive events are then normalized by the normalization engine. '314 patent at 8:3-5. The normalization engine normalizes the primitive events into a "normalized event 115," which is in "a standardized format the system can recognize." '314 patent at 8:3-6. The specification points out that "each type of sensory device may have its own normalization engine." '314 patent at 8:8-9.  Alternatively, "one normalization engine as shown in FIG. 1 may have multiple modules for each type of sensory device." '314 patent at 8:15-17.

35.    In the described embodiment, "[n]ormalized events 115 are placed in event queue 116 for processing by correlation engine 117." '314 patent at 8:22-24. The basic function of the correlation engine is to "correlate[] two or more primitive events, combinations of primitive events and compound events, and combinations of compound events." '314 patent at 8:37-40. Carrying out this function is quite complex. Figure 2 shows how the correlation engine works in one embodiment of the invention:

---

[2] For ease of reference, all citations are to the '314 patent, however, all of the Asserted Patents contain the same elements cited herein.



'314 patent at Fig. 2 (rotated)

36.    As described by the specification, the correlation engine receives normalized events from the normalization engine. '314 patent at 8:20-25. These normalized events are then filtered by a privacy filter 204, which applies a set of privacy rules defined by a system administrator. '314 patent at 9:16-20. For example, a privacy rule may instruct the system to ignore all primitive events between certain time periods, or to disregard other categories of data. '314 patent at 9:22-41.

37.    After applying the privacy filter, the correlation engine applies the business filter, which applies a set of business rules set by a system administrator. '314 patent at 9:41-54. The objective of the business filter is to "eliminate [] unnecessary false alarms by disregarding events when they are not significant based on normal business processes." '314 patent at 9:52-54. For example, in a security system designed to guard a data center, a business filter could be configured to ignore

17

primitive events taking place during hours when the data center is scheduled to be serviced. '314 patent at 9:45-48.

38.    After the correlation engine has filtered primitive events based on the privacy and business rules, it evaluates the remaining primitive events for the presence of "compound events"—events that are composed of one or more primitive events. '314 patent at 9:55-58. An example of a compound event is tailgating (i.e., where two or more persons enter a designated area as detected on the video data using a person-counting algorithm, when only one corresponding swipe/access card is detected by the legacy access control system). '314 patent at 9:58-65. Compound events "may include primitive events from one sensor, from two or more sensors, or even from two disparate types of sensors."). '314 patent at 9:67 – 10:3.

39.    Next, the correlation engine uses a "correlation module 210" to correlate both the primitive and compound events across geographical space. '314 patent at 10:4-6.  For example, the correlation engine may identify multiple tailgating events in different parts of a facility, or the loitering of two different vehicles in different parts of a campus. '314 patent at 10:10-12. The correlation module also correlates events across time, by comparing events detected presently with events detected in the past. '314 patent at 10:12-16.  Examples include detection of the presence of the same individual allowing another to tailgate at different times, or the same person loitering or being stopped multiple times by security. '314 patent at 10:16-21.

40.    The correlation engine's forensic analysis of events is depicted in even greater detail in Figure 10 of the specification:



'314 patent, Fig. 10.

Figure 10 depicts various sets of video data (*i.e.*, $V_1$ through $V_i$; the large circles in the first column), with each subset corresponding to data obtained from a particular video camera. '314 patent at 32: 39-49. The dashed circles inside $V_1$ through $V_i$ each represent a subset of video data. *Id.*

41.    Figure 10 also depicts various sets of metadata (*i.e.*, $M_1$ through $M_i$; the large circles in the second column).'314 patent at 32:50-56. Each set of metadata is indexed and points to at least one set of video data. '314 patent at 32:56-57.  In Figure 10, each set of metadata corresponds to one and only one set of video data, but the specification is clear that the relationship between metadata and video data may be one-to-many, many-to-one, as well as many-to-many. '314 patent at 32:57-64.

42.    Finally, Figure 10 depicts various sets of attribute weight data (i.e., $W_1$ through $W_i$; the large circles in the third column). '314 patent at 32:65-67. The sets of

attribute weight data "are sets of vectors … which represent weights associated with subsets of the metadata M1." '314 patent at 32:67-33:2. These weights may be multi-dimensional. '314 patent at 33:4-7. For example, a two-dimensional weight may represent the attribute weights associated with (i) the reliability of a particular video camera for motion detection reliability; and (ii) the reliability of that camera for gunshot detection reliability. '314 patent at 33:7-11. This would enable the system to account for the fact that a camera might have high motion detection reliability and low gunshot detection reliability, or vice-versa. '314 patent at 33:11-14. The specification provides an equation that can be used for determining weights for attribute data:

$$w_i = \sum_{k=1}^{N} \omega_k a_k$$

'314 patent at 36:27-34.

In this equation, "[t]he weights "$\omega_i$" may be a weighted average of attribute data ($\alpha_i$)." '314 patent at 36:14-22. The symbol "$\omega_k$" refers to relative weights of the attributes ($\alpha_k$), "which are themselves weights associated with the data sources." '314 patent at 36:34-36.

43.    The specification further discusses how attribute weights may be recalculated to yield the weighted attribute data of (i) two or more events occurring substantially simultaneously, or (ii) any of two or more events occurring substantially simultaneously. '314 patent at 35:9-33. Respectively, the formulae are as follows:

20

(i) $W(M_1 \cap M_2) = W(M_1) \cdot W(M_2)$

(ii) $W(M_1 \cup M_2) = W(M_1) + W(M_2) - W(M_1) \cdot W(M_2)$

*Id.*

44.    As the compound events and correlated events are detected, the correlation module stores them in the events database 118. '314 patent at 18:62-66. The data may be stored in an events table such as the following:

TABLE 3

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Events table | | | | |
| MDEntryID | MDParameterID | MD_Event_DateTime | MD_Event_Duration | SrcID | Src_Description | Src_Location |
| . . . | . . . | . . . | . . . | . . . | . . . | . . . |
| 432 | 6 | Sep. 27, 2007 7:05:24PM | 1:05 | 1 | Camera 1 | Lobby |
| 433 | 16 | Sep. 27, 2007 7:10:18PM | 0:01 | 1 | Camera 1 | Lobby |
| 434 | 11 | Sep. 27, 2007 8:13:08PM | 0:01 | 9 | Card Reader in Server Room | Server Room |
| 435 | 10 | Sep. 27, 2007 8:13:10PM | 0:02 | 4 | Camera 34 | Server Room |
| 436 | 10 | Sep. 27, 2007 8:13:14PM | 0:02 | 4 | Camera 34 | Server Room |
| 437 | 12 | Sep. 27, 2007 8:13:24PM | 0:06 | 4 | Camera 34 | Server Room |
| 438 | 14 | Sep. 27, 2007 9:05:00PM | 0:26 | 23 | Registered Student | Off-campus (River St.) |
| 439 | 15 | Sep. 27, 2007 9:14:04PM | 0:10 | 2 | Camera 2 | Parking Lot |

'314 patent at Table 3.

Here, the column "MDEntryID" contains the unique identifiers of the events. '314 patent at 23:37-40 and Table 3. "MDParameterID" refers to the types of events that were detected, which are fully described in a separate Metadata parameters table. *Id.* An example of a Metadata parameters table is as follows:

TABLE 1

Meta-data parameters table

| MDParametersID | Nickname | MDTypeID | SrcID | MD_TimeStart | MD_TimeEnd |
|---|---|---|---|---|---|
| 6 | Motion in Camera 1 | 1 | 1 | 17:00 | 8:00 |
| . . . | . . . | . . . | . . . | . . . | . . . |
| 10 | Person Enters Server Room | 23 | 4 | 0:00 | 23:59 |
| 11 | Swipe Card Detected to Server Room | 22 | 9 | 0:00 | 23:59 |
| 12 | Tailgating | 24 | 4 | 0:00 | 23:59 |
| 13 | Anonymous Video Tip | 98 | 22 | 0:00 | 23:59 |
| 14 | Registered Student Video Tip | 98 | 23 | 0:00 | 23:59 |
| 15 | Stolen Plate | 99 | 2 | 17:00 | 8:00 |
| 16 | Camera 1 loses connection | 105 | 1 | 0:00 | 23:59 |

'314 patent at Table 1.

Here, the "MDParametersID" column contains the unique identifiers of the metadata parameter, '314 patent at 23:37-40, and "MDTypeID" refers to the Metadata types, which are fully described in a separate Metadata types table. '314 patent at 21:18-19 and Table 2. The "SrcID" column refers to the Sources table, which describes the devices (such as video cameras and card readers) used by the correlation engine. '314 patent at 21:19-21 and Table 4. The specification provides a number of examples to illustrate the functionality of the Metadata parameters table and its relationship among the other tables. One example is as follows:

> For example, the row "MDParametersID=6" corresponds to an event with a nickname "Motion in Camera 1." This event has "MDTypeID=1", which by examining Table 2 corresponds to a motion event. It has "SrcID=1", which by examining Table 4 corresponds to Camera 1 located in a lobby. Based on "MD_TimeStart" and "MD_TimeEnd", this event is only being monitored and recorded between the hours of 5:00 PM (17:00) and 8:00 AM (8:00) to protect privacy or to follow a business rule.

'314 patent at 21:25-33.

45.    When the rule evaluation module 214 retrieves the events in the events database, it does so in accordance with a set of rules from a rules database 216. '314 patent at 10:26-28. An exemplar Rules table from the rules database is depicted as follows:

TABLE 5

| | | | | | |
|---|---|---|---|---|---|
| Rules table | | | | | |
| RuleID | Nickname | MDParamterID | ThresholdValue | ContactID | MsgTxt |
| 1 | Alert 1 | 6 | null | 4 | Motion in lobby during forbidden hours |
| 2 | Tailgating SR | 12 | null | 1 | Tailgating in server room |
| 3 | Global Alert | null | 61 | 7 | Null |
| 4 | Stolen Plate | 15 | null | 2 | Stolen plate detected in parking lot |
| 5 | Camera 1 goes down | 16 | null | null | Camera 1 has lost connection! |

'314 patent at Table 5.

An exemplar description of an alert defined in Table 5 is provided by the specification:

> In the sample Rules table shown in Table 5, "AlertID" is a primary key uniquely identifying each rule, "Nickname" provides a nickname for each rule, "MDParameterID" specifies which event (including primitive or compound events) that triggers the alert (or null if a system-wide alert), "ThresholdValue" specifies a threshold value which triggers an alert (for correlated system-wide alerts, or null if an event-based alert), "ContactID" specifies the group, or individual, that will receive the alert, or the set of actions that will be triggered by the alert, and "MsgTxt" specifies the text of the message sent on an alert. "ContactID" is a foreign key into another table (not shown) that specifies the list of recipients or the list of actions to be performed when the alert corresponding to "ContactID" is triggered.

'314 patent at 28:46-59.

46.    The above description of the database tables is only a summary. The specification's "Database Design" section describes in great detail these and various

23

other database tables, as well as the relationships among them. '314 patent at Tables 1-7.

47.    Based on the evaluation of rules by the rule evaluation module 214, the correlation engine issues alerts or performs other appropriate actions. '314 patent at 10:31-33. These alerts may be issued in real-time in response to the correlation exceeding a particular threshold. '314 patent at 35:35-52. Sets of specific conditions may also be specified, and alerts and other actions can be configured to be triggered only when a certain set of conditions are met. *Id.*

48.    Further, actions can be configured to be triggered based on "accumulated value of multiple events across space and time." '314 patent at 35:53-56. Although the specification provides that various equations may be used, it provides three examples of such equations:

$$a_1: \sum_{i=1}^{i=N} w_i \cdot x_i + \sum_{i=1}^{m} w_i \cdot v_i \geq \tau_1$$

$$a_2: \sum_{i=1}^{i=N} w_i \cdot x_i + \sum_{i=1}^{m} w_i \cdot v_i \geq \tau_2$$

$$\ldots$$

$$a_n: \sum_{i=1}^{i=N} w_i \cdot x_i + \sum_{i=1}^{m} w_i \cdot v_i \geq \tau_n$$

'314 patent at 36:1-13.

In these equations, "a" indicates an action, "w" indicates attribute weights, "x" indicates non-video events, and "v" indicates video events. '314 patent at 35:60-62.

24

These equations "could represent a hierarchy of actions that would be activated for different threshold scenarios." '314 patent at 35:62-64.

49.    The Asserted Patents also describe a Hierarchical Storage Manager (HSM) for intelligent storage of large volumes of data created by security and surveillance applications. Figure 4.



'314 patent at Figure 4 (rotated).

The HSM resolves a problem that arises from the sheer volume of sensor data in smart surveillance systems. Routine operation of the sensors in the claimed invention

generate large amounts of data. '314 patent at 12:23-38. "For example, a typical 3-Megapixel digital surveillance camera generates images of approximately 280 Kbytes per second per frame. If the camera were running at 5 frames per second, it would generate approximately 60 GB per day. . . In a typical application having 100 surveillance cameras around a particular facility, this translates to 6 TB per day…or approximately 2,000 TB per year." *Id*. "Ideally, requested data should be retrieved at the fastest rate and this is possible only if all of the data is available on high-speed devices at all the time, but this is beyond the ability of most organizations." *Id*. HSM enables data to be moved from a faster storage medium (like cache) to a slower storage medium (such as tape). '314 patent at 12:23-49. One of the benefits of Hierarchical Storage is that "performance is improved as unused data is moved to lower level storage devices and frees up higher level (faster) storage devices, thus increasing overall system performance." *Id*.

50.    The Patent discloses particular ways of "cascading" storage.   One embodiment is illustrated by video data. '314 patent at 12:50-61. A video data segment is stored by its importance ("Y"), which may be calculated as weighted attributes of the data (including attributes of the camera). '314 patent at 12:61-66. Such attributes include resolution of the data ("R"); reliability of the source (such as whether derived from a "video tip", "RS"); age of camera ("A"); location of camera ("L"); time since video was last accessed ("TS"); time of collection ("TM") and whether the data includes a "primitive event," along with attributes of the data. '314 patent at 12:64-13:18. A "primitive event" is an "atomic, indivisible event[s] from any

subsystem," such as people entering a designated area, a package left behind in an area, a gunshot detected, a count of the number of cleaning people entering a building at a certain time, locks on gates not engaged, and so on. '314 patent at 5:21-48.

51.    The importance of the video data segment may be calculated as a weighted average, as shown in the equation ($a_i$ is the attribute of the data and $w_i$ is the relative weight):

$$Y = \sum_{i=1}^{i=N} w_i a_i$$

'314 patent at 36:27-34.

52.    For example, in a case of six attributes to a particular video data segment, each weighted equally, the importance is calculated as "Y=(L+R+A+RS+TM+TS)/6." '314 patent at 13:63-67. Depending on the value of Y, the video data may be stored in the highest or other lower storage hierarchy. '314 patent at 13:61-17:13. When a given hierarchical level becomes nearly full, the video segments of lowest importance are automatically cascaded to free space to accommodate new data. *Id*. A hierarchical storage manager (HSM) 401 manages the storage of the video data segments and their corresponding locations. citing '314 patent at 15:7-11. The stored events may be later queried and retrieved from the appropriate hierarchy and migrated to a faster location for processing.

53.    The HSM system is complex and implements the following functions and sub-systems or a sub-set thereof, as described in detail in the patent: (a) storage

hierarchy including on-site and off-site (network or cloud based) storage of various speeds and cost; (b) HSM Migration: data migration policy between different levels codified by preset mathematical rules or operator override; (c) HSM Archiving: archival of data to slower or remote storage based on importance or frequency of use; (d) HSM Rules Engine: automated control or change of data storage location based on predefined policy rules being triggered; and (e) HSM Audit Trails: storage of an audit record including information about each data access event to enhance data privacy. In summary, the HSM provides a detailed formal design and framework of operation to handle the large amounts of data produced by security and surveillance systems.

**THE ASSERTED PATENTS ARE IMPROVEMENTS OVER THE PRIOR ART**

54.    In 2006 and 2007, prior art security systems were capable of collecting and displaying sensory data from a variety of sources.  These systems, however, had a number of limitations that prevented them from effectively making complex deductions from that data.

55.    One such limitation with the prior art systems was that they were unable to effectively account for disparate qualities of data obtained from multiple sensors. For example, a system that obtained data from an old analogue video camera may treat that data exactly the same as data retrieved from a newer digital video camera. This problem could thwart the detection of threats. For example, if the analogue video data were sufficiently imprecise relative to the digital video data, the system would have no way of accounting for the discrepancy and, in considering the

data from both sources simultaneously, may fail to detect the threat. The Asserted Patents address this limitation by weighting the "attribute data" of the sensors. For example, because the digital camera may be more reliable than the analogue camera, the system may weight data from the digital camera more heavily than data from the analogue camera.

56.     Another limitation of prior art security systems is that they were unable to effectively correlate data obtained at different times from various types of sensors located in different geographical locations. For example, a large institution may have security cameras and other types of sensors distributed throughout a large geographical area over several square miles. Although prior art security systems could certainly obtain data from such distributed sensors, they were unable to effectively process the data in such a way that conclusions could be deduced from them. The patents explain that prior art systems were unable to effectively process related data collected from numerous security systems, such as gunshot detection systems, video surveillance systems, tip information systems, and legacy security systems. Accordingly, the specification identifies the need for a method that "weights input data from disparate systems to lower false alarm rates and to filter out unwanted, spurious, or intentionally distracting information." '314 patent at 2:6-10. The Asserted Patents solve this limitation by detecting primitive events from various types of sensors, and by correlating multiple primitive events across time and geographical space. After the invention has correlated the primitive events, actions can be taken based on these correlations. The '314 patent for example—generates

new rules based on the correlated primitive events and the actions taken, so that future events can be more accurately correlated, with the appropriate actions being undertaken automatically.

57.    Computerized weighting and correlation as claimed by the Asserted Patents is a non-conventional approach to data correlation in computerized security systems in 2006 and 2007.

58.    The Asserted Patents are designed to solve problems arising specifically within the realm of computerized security systems. These problems are quite different from the problems faced by security guards.  It is not possible for human beings to react to all the types of events (e.g. primitive events, time-correlated events, location-correlated events, compound events) in the systematic manner demonstrated by the system. While a security personnel member may be able to react to an event (e.g. an individual loitering) satisfactorily, the successful response to time-correlated, location-correlated, compound events involves increasing levels of difficulty that cannot be duplicated by humans.  For example, events across different locations may be impossible to detect by humans since they cannot be in these disparate locations simultaneously.

59.    The new security system claimed in the Asserted Patents is complementary to, and does not replace, human security guards.  The security system provides actionable intelligence to the human security guards, enhances their abilities, and does correlations they could never have done.  It is based on types of data that security guards simply do not and cannot consider.

**THE ASSERTED PATENTS ARE INVENTIVE CONCEPTS UNDER *ALICE***

60.    The Asserted Patents are in the same family of patents. SecureNet, the applicant, filed a patent application in the family that issued as U.S. Patent No. 9,934,616 (the "'616 Patent") after June 2014 when the U.S. Supreme Court decided *Alice Corp. Party Ltd. v. CLS Bank, Int'l*, 573 U.S. 208, 216 (2014) ("*Alice*"). The '616 patent issued on May 17, 2016.

61.    In *Alice*, the Supreme Court outlined three narrow exceptions to patent eligibility ("laws of nature, natural phenomena and abstract ideas") and established a test for determining patent eligibility. *Id*. Under *Alice*, 'inventive concepts' sufficient to 'transform' the claimed abstract idea are eligible for patentability. *Id*. Whether a patent contains an 'inventive concept' entails consideration of the elements of each claim "both individually and as an ordered combination to determine whether they involve more than the performance of well-understood, routine, and conventional activities" to those skilled in the art at the relevant time. *Id*.

62.    During prosecution of the '616 patent in a November 4, 2015 interview, the applicant discussed with the Patent Examiner whether this patent would be eligible as an "inventive concept" under the test set forth in Alice and under 35 U.S.C. §101.

63.    The applicant also addressed Alice during the prosecution of later issued patents in the same family such as U.S. Patent No. 11,323,314, confirming the patentability of the issued claims under 35 U.S.C. §101.

64.    The prosecution histories for the Asserted Patents, and patents in the same family, are useful to show that certain limitations—either alone or in combination—constitute "inventive concepts" over the then-existing prior art. Specifically, in Step 2 of the *Alice* assessment of the Asserted Patents, the Applicant identified the following ideas as "inventive concepts," *either alone or in combination*:

> evaluating one more historical correlations by automatically analyzing said stored sensory events, ***across at least one of time and space***, for one or more historical correlations stored among the sensory events; monitoring continuously and in-real time the primitive sensory events from one or more sensors based on the one or more historical correlations to identify one or more critical events . . . sending one or more alerts based on at least one of said critical events and said network failures events," which is an unconventional improvement of the state of the art at the time the applicant filed as evidence by the prior art cited in the IDS.

'616 Prosecution History (emphasis in original).

65.    During the prosecution of the applications that issued as the Asserted Patents, the applicant confirmed the patentability of the inventions under each of Sections 101, 102, 103, and 112 of Title 35.

66.    Attached hereto as **Exhibit A** is the declaration of Richard C. Helfers, Ph. D. ("Helfers Decl.") Dr. Helfers is a professor of criminal justice with decades of experience in policing and security-related work.

67.    Dr. Helfers explains that the Asserted Patents are not directed at the kinds of duties that security guards perform. Rather, the patents are directed at problems that exist within the realm of computer problems that security guards have never been tasked with performing. Helfers Decl. at ¶8. He further explains that the Asserted Patents account for disparate qualities of data obtained from different

sensors, by weighting the "attribute data" of the sensors. *Id*. at ¶9. Security guards, on the other hand, do not typically interact with "attribute data of the sensors," or use attribute data to "weight" primitive events as required by the '314 patent. *Id*. at ¶10.  These issues exist within the realm of computerized security systems.

68.    He further explains that, "[w]hile it is true that security guards utilize computerized security systems and information from security systems, security guards do not use computerized security systems in the manner described and claimed in the Asserted Patents." *Id*.  "One reason for this is that security guards typically do not have information on the "attribute data" of a given sensor." *Id*.  As an example, a "security guard typically has no information on when a given sensor was last maintained, which is one type of attribute data described in the patent specification." *Id*. at ¶11.  "This type of attribute data is usually stored in databases only accessible by IT personnel.  It is not the kind of data that security guards have access to, much less take into account during their day-to-day functions monitoring security systems." *Id*. "Similarly, security guards typically have no access to other technical attribute data of sensors, such as the reliability of the bandwidth or power going to a given sensor, (another type of attribute data described and claimed in the Asserted Patents).  Only IT personnel typically have access to this type of information." *Id*. at ¶12.

69.    He states further that, the Asserted Patents are directed at solving "correlating data obtained from different types of sensors located in different geographical locations." *Id*. at ¶14. "Although security guards certainly do observe

video monitors that display scenes from video cameras in different locations, they do not perform the type of 'correlation' at which the patents are directed." *Id*. Rather, "[t]he correlation described in the patents can only be performed by computers capable of processing digital data."  *Id*. at ¶16.  One example of the digital data involved in the correlation described in the Asserted Patents is the "attribute data" of sensors.  The Asserted Patents explain that attribute data can include information about primitive events (in other words, security related data from sensors that indicate the occurrence or non-occurrence of particular events).  These primitive events can be correlated with the actions taken to generate new rules so that future events can be more accurately correlated with the appropriate actions being undertaken automatically." *Id*.

70.    Dr. Helfers concludes that "the type of correlation disclosed by the patents exists solely within the realm of computerized security systems. Security guards use human senses to observe their surroundings and video monitors to respond to threats.  Based on how 'correlation,' 'weighting,' 'attribute data,' and 'generating rules' are described in the Asserted Patents, security guards do not 'correlate' events 'weighted by attribute data,' and do not 'generate' new 'rules' that are followed automatically". *Id*. at ¶17.

71.    In his declaration, Dr. Helfers also explains that, "[t]he Asserted Patents also provide a manner to compare data that originates from different types of sensors and security systems.  Different sensors and systems may use disparate protocols, each with its own proprietary data format.  This has traditionally prevented data

34

from different sensors or systems from being compared." *Id*. at ¶18.  "The Asserted Patents address this problem by 'normalizing' this data so that it can be effectively compared."  *Id*.  "Security guards do not normalize data by accounting for discrepancies between digital protocols and data formats used by sensors and security systems." *Id*. at ¶19.

72.    For example, "security guards are used to using a disparate array of 'siloed' computerized security systems that do not 'talk' to each other. This leaves the security guard with a disorganized array of incompatible and confusing data. The disparate computerized security systems historically available to security guards may often cause more confusion, obfuscating a real threat rather than illuminating it." *Id*.  In contrast, the "Asserted Patents solve this problem by utilizing a computerized correlation engine that takes data from multiple sources that have been normalized by a normalization engine.  The normalization engine transforms the data from various unrelated security systems into a coherent picture for the security guards to then take action on. This is not something that was available to security guards previously." *Id*. at ¶20.

73.    Dr. Helfers summarizes that an "individual could not perform the Asserted Patents' functions mentally or with pen and paper. The Asserted Patents describe problems and solutions existing within the realm of computerized security systems and involve performing complex computerized correlations of normalized sensory data.  These types of complex computerized correlations cannot be reduced to human calculations on paper or to mental processes."  *Id*. at ¶21.

## DEFENDANTS' PRODUCT OFFERINGS

74.    Defendants offer software linking data from various sensors, storage, analytics, and services, as well as hardware to be used with the same, to enable its customers to deploy systems and methods that practice Plaintiff's claimed inventions.

75.    Defendants sell the Philips Hue Ecosystem, which includes the Hue Secure Camera, the Philips Hue Application, the Hue Bridge Pro, and Philips Hue Cloud, which together implement the inventions in the Asserted Patents.

76.    Claim 13 of the '314 Patent includes the following element: "receive one or more sensory events from a sensory event analytics module that receives sensory data about a physical environment from one or more sensors and processes the sensory data from the one or more sensors to detect the one or more sensory events, wherein the one or more sensors comprises at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events are selected from the group consisting of a face detected, a vehicle detected, a license plate detected, a size of an object, and a speed of an object."

77.    Claim 20 of the '870 Patent includes the following element: "an receiver module to receive one or more sensory events from a sensory event analytics module that receives sensory data about a physical environment from one or more sensors and processes the sensory data from the one or more sensors to detect the one or more sensory events, wherein the one or more sensors comprises at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events are selected

from the group consisting of a face detected, a vehicle detected, and a license plate detected."

78.    Claim 17 of the '342 Patent includes the following element: "a receiver to receive one or more sensory events from a sensory event analytics module that receives sensory data about a physical environment from one or more sensors and processes the sensory data from the one or more sensors to detect the one or more sensory events, wherein the one or more sensors comprise at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events are selected from the group consisting of a face detected, a vehicle detected, and a license plate detected."

79.    The Philips Hue Ecosystem includes a receiver that receives sensory events from a sensory analytics module where one of the sensor is an IP video camera and one of the sensory events is a face detected. In particular, the Hue Secure Cameras include the Hue Secured Wired Camera, Hue Secure Battery Camera, Hue Secure Floodlight Camera, Hue Secure Video Doorbell, which are sold in the Home Depot in Plano, Texas.



80.    Secure Cameras are IP video cameras with processors that capture image frames upon detecting motion. The Secure Cameras trigger recording of continuous video data. Additional processing of the sensor data is performed in the Hue Cloud, which receives encrypted sensor data via transmission from Hue Camera to Hue Secure Cloud. The processing of recorded video data detects and identifies a person, including a face. On information and belief, the Philips Hue Ecosystem also detects the size of an object or speed of an object, such as a package.

81.    Claim 13 of the '314 Patent includes the following element: "a hierarchical storage manager having access to a hierarchy of two or more data storage devices, wherein the two or more data storage devices are adapted to store data from the one or more sensors, wherein the hierarchical storage manager is adapted to manage storage and cascade of data through the hierarchy of two or more data storage devices based at least on the sensory events."

82.     Claim 20 of the '870 Patent includes the following element: "a hierarchical storage manager having access to a hierarchy of two or more data storage devices, wherein the two or more data storage devices are adapted to store data from the one or more sensors, and wherein the hierarchical storage manager is adapted to manage storage and cascade of data through the hierarchy of two or more data storage devices based at least on the sensory events."

83.     Claim 17 of the '342 Patent includes the following element: "a hierarchical storage manager having access to a hierarchy of two or more data storage devices, wherein the two or more data storage devices are adapted to store data from the one or more sensors, and wherein the hierarchical storage manager is adapted to manage storage and cascade of data through the hierarchy of two or more data storage devices based at least on the sensory events."

84.     The Hue Ecosystem includes a hierarchical storage manager having access to a hierarchy of two or more data storage devices. First, data is buffered locally on Secure Cameras. Then, recorded video data triggered by motion detection is stored in Hue Cloud. Finally, an event timeline is cached and available via the Hue Application on a user's smart phone. The data is stored based on at least the sensory events. *See, e.g.*, subscriptions available to users in Hue Cloud:





85.     Claim 13 of the '314 Patent includes the following limitation: "a correlation module to evaluate one or more historical correlations among the stored sensory events, wherein the correlation module evaluates the stored sensory events for the one or more historical correlations across at least one of time and space, wherein the correlation module is adapted to monitor the received sensory events to

40

identify one or more critical events, and wherein the one or more critical events are based at least on the one or more historical correlations."

86.    Claim 20 of the '870 Patent includes the following limitation: "a correlation module to evaluate one or more historical correlations among the stored sensory events, wherein the correlation module evaluates the stored sensory events for the one or more historical correlations across at least one of time and space . . . ."

87.    Claim 17 of the '342 Patent includes the following limitation: "a correlation engine to evaluate one or more historical correlations among the stored sensory events, wherein the correlation engine evaluates the stored sensory events for the one or more historical correlations across at least one of time and space . . . ."

88.    One example of a historical correlation of stored sensory events is as follows: (a) motion detection that instantiates continuous recording of video data and (b) the identification of a package in the recorded video data; and (c) the continued recording of video data until cessation of motion. *See* https://www.philips-hue.com/en-us/support/topic/cameras/100065#What_is_package_detection

> How do I test my Philips Hue Secure system?
> Set your system to Armed: Away and purposely trigger a contact sensor, indoor motion sensor, or camera. Simply walk around your house and open doors or windows that your contact sensor is on, or walk past an indoor motion sensor or camera. If you receive a notification (provided you have enabled them), your system is working.
>
> What is package detection?
> Package detection is an advanced feature that comes with a Secure Basic or Plus plan. It uses AI to detect a package delivery, so you can set it to send notifications only if a delivery is detected — while disregarding movements like those of pets.

> Package detection is only possible after setting up the package detection through the Hue app.

89.     Claim 13 of the '314 Patent includes the following element: "wherein the sensory events are weighted based at least on one or more attribute data of the one or more sensors used to capture the sensory data."

90.     Claim 20 of the '870 Patent includes the following limitation: "the correlation module evaluates the stored sensory events for the one or more historical correlations across at least one of time and space based on at least weighting of the stored sensory events."

91.     Claim 17 of the '342 Patent includes the following limitation: "correlation engine evaluates the stored sensory events for the one or more historical correlations across at least one of time and space based on at least weighting of the stored sensory events, and wherein the stored sensory events are weighted based at least on one or more attribute data associated with the sensory data."

92.     The Philips Hue Ecosystem weights sensory events. *See* https://www.signify.com/en-gb/our-company/news/press-releases/2023/20230831-philips-hue-integrates-smart-lighting-sensors-and-cameras-to-help-secure-your-home

> Using the Philips Hue app, you can personalise your camera settings. Create Blackout zones, which make certain areas of the video feed private, or Activity zones, which prevent areas from sending notifications — particularly useful for busy sidewalks in front of the house. Users can arm and disarm the system, set up special armed

states for whether they are home or away, review a timeline of events, and more.

Hue's use of Activity Zones as well as the sensitivity of motion detection in the Secure Camera, adjusted via the Hue Application, weight sensory events based at least on one or more attribute data associated with the sensory data.

93.    Claim 13 of the '314 Patent includes the following limitations:

wherein the correlation module is adapted to monitor the received sensory events to identify one or more critical events, and wherein the one or more critical events are based at least on the one or more historical correlations; and

an alerting module to send one or more alerts based on the one or more critical events,

wherein communication between the sensory event analytics module, the hierarchical storage manager, the correlation module, and the alerting module occurs over an IP network.

94.    The Hue Ecosystem includes a correlation module that identifies a critical event based on the historical correlation. For example, for the above historical correlation of sensory events --- (a) motion detection that instantiates continuous recording of video data and (b) the identification of a package in the recorded video data; and (c) the continued recording of video data until cessation of motion –- the critical event is the leaving of a package. The Hue Ecosystem will provide a notification of a package left.

What is package detection?
Package detection is an advanced feature that comes with a Secure Basic or Plus plan. It uses AI to detect a package delivery, so you can set it to send notifications only if a delivery is detected — while disregarding movements like those of pets.

> Package detection is only possible after setting up the package detection through the Hue app.

On information and belief, the "communication between the sensory event analytics module, the hierarchical storage manager, the correlation module, and the alerting module occurs over an IP network."

95.     Claim 13 of the '314 Patent includes the following element "an event queue having access to an event database to store the sensory events for later retrieval as stored sensory events."

96.     Claim 20 of the '870 Patent includes the following element "an event queue having access to an event database to store the sensory events for later retrieval as stored sensory events."

97.     Claim 17 of the '342 Patent includes the following element "an event queue having access to an event database to store the sensory events for later retrieval as stored sensory event."

98.     On information and belief, in the Hue Ecosystem, sensory events generated by Secure devices are ingested into a cloud event-processing queue for asynchronous handling (e.g., notifications and system events), and the queue writes event records to a cloud event/timeline store that the Hue app later retrieves as stored sensory events.

## THE ASSERTED CLAIMS

## COUNT 1
## Infringement of U.S. Patent No. 11,323,314

99.    Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

100.    Plaintiff is the owner by assignment of United States Patent No. 11,323,314, entitled "HIERARCHICAL DATA STORAGE AND CORRELATION SYSTEM FOR CORRELATING AND STORING SENSORY EVENTS IN A SECURITY AND SAFETY SYSTEM." The '314 Patent was duly and legally issued by the United States Patent & Trademark Office on May 3, 2022. A true and correct copy of the '314 patent is attached as **Exhibit 1**.

101.    Defendants have offered for sale, sold and/or imported in the United States products that directly or indirectly infringes the '314 patent since the issuance of the '314 Patent.

102.    Defendants have directly and indirectly infringed and continue to infringe the '314 Patent, for example, by making, selling, offering for sale, and/or importing, and through its own use and testing of the accused products in the United States and here in Texas. In addition, on information and belief, Defendants use the accused products while providing technical support and repair services to Defendants' customers.

## COUNT 2
## Infringement of U.S. Patent No. 11,929,870

103.    Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

104. Plaintiff is the owner by assignment of United States Patent No. 11,929,870, entitled "CORRELATION ENGINE FOR CORRELATING SENSORY EVENTS." The '870 Patent was duly and legally issued by the USPTO on March 12, 2024. A true and correct copy of the '870 Patent is attached as **Exhibit 2**.

105. Defendants have offered for sale, sold and/or imported in the United States products that directly or indirectly infringes the '870 Patent since the issuance of the '870 patent. Defendants have directly and indirectly infringed and continue to infringe the '870 patent, for example, by making, selling, offering for sale, and/or importing accused products, and through its own use and testing of them in the United States and here in Texas. In addition, on information and belief, Defendants use them while providing technical support and repair to Defendants' customers.

**COUNT 3**
**Infringement of U.S. Patent No. 12,375,342**

106. Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

107. Plaintiff is the owner by assignment of United States Patent No. 12,375,342, entitled "CORRELATION ENGINE FOR CORRELATING SENSORY EVENTS." The '342 Patent was duly and legally issued by the USPTO on July 29, 2025. A true and correct copy of the '342 patent is attached as **Exhibit 3.**

108. Defendants have offered for sale, sold and/or imported in the United States accused products that directly or indirectly infringes the '342 patent since the issuance of the '342 patent. Defendants have directly and indirectly infringed and

continue to infringe the '342 patent, for example, by making, selling, offering for sale, and/or importing accused products, and through its own use and testing of them in the United States and here in Texas. In addition, on information and belief, Defendants use them while providing technical support and repair to Defendants' customers.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully prays the Court enter:

a. A judgment in favor of the Plaintiff that Defendants have infringed, either literally and/or under the doctrine of equivalents and either directly or indirectly, U.S. Patent Nos. 11,323,314, 11,929,870, and 12,375,342;

b. A permanent injunction enjoining Defendants from committing further acts that infringe upon the Asserted Patents;

c. A judgment and order requiring Defendants to pay Plaintiff its damages, costs, expenses, and prejudgment and post-judgment interest for its infringement of the Asserted Patents, as provided under 35 U.S.C. § 284;

d. A judgment and order requiring Defendants to provide an accounting and to pay supplemental damages to Plaintiff, including without limitation, prejudgment and post-judgment interest;

e. A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285, including that the Defendants have

willfully infringed the Asserted Patents and awarding to Plaintiff its

reasonable attorneys' fees against Defendants;

f.   A post-verdict accounting; and

g.   The Plaintiff further prays that the Court grant all other relief to

which the Plaintiff may show it is entitled and as this Court deems

just and equitable.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

DATED this 18th day of December 2025.

Respectfully submitted,

MICHAEL BEST & FRIEDRICH LLP

*/s/ Katie A. Fillmore*
Katie A. Fillmore (Lead Attorney)
State Bar of Texas # 24069717
515 Congress Ave. #2500
Austin, TX 78701
Tel. (512) 320-0601
Fax (512) 640-3170
Katie.Fillmore@michaelbest.com

ATTORNEYS FOR PLAINTIFF

48